# No. 22-16584

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

WESCO INSURANCE COMPANY,

*Plaintiff and Appellee,*

*vs.*

BRAD INGRAM CONSTRUCTION,

*Defendant and Appellant,*

_____

On Appeal from a Judgment of the District Court
Northern District of California, no. 3:21-05682-WHO
Honorable William H. Orrick
_____

## ANSWERING BRIEF
_____

DANIEL N. KATIBAH
JAMES C. NIELSEN
MEGAN W. WENDELL
NIELSEN KATIBAH LLP
100 Smith Ranch Road, Suite 350
San Rafael, California 94903
(415) 693-0900
Facsimile (415) 693-9674

*Attorneys for Plaintiff and Appellee*
WESCO INSURANCE COMPANY

## CORPORATE DISCLOSURE STATEMENT
[F.R.A.P. Rules 26.1 and 28(a)(1).]

Appellee Wesco Insurance Company is a 100%, direct subsidiary of AmTrust Financial Services, Inc.  Evergreen Parent L.P. indirectly owns 100% of AmTrust Financial Services, Inc.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT     ii

TABLE OF CONTENTS     iii

TABLE OF AUTHORITIES     vi

INTRODUCTION     10

STATEMENT OF JURISDICTION     12

STATEMENT OF THE CASE     13

1.    Facts     13

     a.    The Wesco policy.     13

     b.    The *Vargas* complaint & Ceres's cross-complaint against Ingram.     15

     c.    Wesco declines to defend Ingram.     19

2.    Proceedings in the district court.     19

STANDARDS OF REVIEW     27

SUMMARY OF ARGUMENT     28

ARGUMENT     30

1.    The *Vargas* lawsuit involved no "ordinary acts of negligence" capable of evading Wesco's pollution exclusion.     30

2.    Excluded "releases" of pollutants were causes in fact of Vargas's sarcoidosis.     34

a.   The district court was correct that clouds of toxic dust amounted to a "release" of pollutants.   34

b.   Wesco's exclusion independently applies because the Camp Fire itself released pollutants that were a "but for" cause of Vargas's sarcoidosis.   41

c.   Ingram's "release" argument premised on *State of California* and *Standun* fails procedurally and substantively.   47

3.   The judgment may be independently affirmed on 'dispersal' grounds.   54

4.   The pollutant releases or dispersals were, "in whole or in part," a cause-in-fact of Vargas's injuries.   57

a.   Vargas's allegations of failure to warn and to provide protective equipment cannot defeat Wesco's pollution exclusion.   57

b.   Ingram's argument that the cause of Vargas's sarcoidosis "may have been something other than a 'pollutant' " is improper speculation.   60

5.   Ingram's theory that pollution exclusions cannot apply to workplace-injury claims is legally and textually meritless.   64

CONCLUSION   67

STATEMENT OF RELATED CASES   68

iv

CERTIFICATE OF COMPLIANCE                          69

# **TABLE OF AUTHORITIES**

Federal Cases

*Fireman's Fund Ins. Co. v. Stites*
258 F.3d 1016 (9th Cir. 2001)                             27

*In re Jan Weilert RV, Inc.*
315 F.3d 1192 (9th Cir. 2003)                             48

*Kaufmann v. Kijakazi*
32 F.4th 843 (9th Cir. 2022)                           27, 48

*Kona Enterprises, Inc. v. Estate of Bishop*
229 F.3d 877 (9th Cir. 2000)                             48

*Los Angeles Lakers, Inc. v. Federal Ins. Co.*
869 F.3d 795 (9th Cir. 2017)                             44

*McMillan v. U.S.*
112 F.3d 1040 (9th Cir. 1997)                          27, 48

*Northwest Environmental Defense Center v. Brown*
640 F.3d 1063 (9th Cir. 2011)                          27, 45

*Webster v. Fall*
266 U.S. 507 (1925)                                      65

*Winans v. State Farm Fire & Cas. Co.*
968 F.2d 884 (9th Cir. 1992)                             27

*WTC Captive Ins. Co. v. Liberty Mut. Fire Ins. Co.*
549 F.Supp.2d 555 (S.D.N.Y. 2008)                        58

## State Cases

*24th & Hoffman Investors, LLC v. Northfield Ins. Co.*
82 Cal.App.5th 825 (2022)                    30, 43, 59

*Aerojet-General Corp. v. Transport Indem. Co.*
17 Cal.4th 38 (1997)                              19

*All Green Electric, Inc. v. Security Nat'l Ins. Co.*
22 Cal.App.5th 407 (2018)                    30, 62-63

*American Cas. Co. of Reading, PA v. Miller*
159 Cal.App.4th 501 (2008)                    28, 49

*Armstrong World Industries, Inc. v. Aetna Cas. & Sur. Co.*
45 Cal.App.4th 1 (1996)                    32-33, 38, 45

*Bank of the West v. Superior Court*
2 Cal.4th 1254 (1992)                        38-39, 46

*Cal. Traditions, Inc. v. Claremont Liability Ins. Co.*
197 Cal.App.4th 410 (2011)                        47

*Cold Creek Compost, Inc. v. State Farm Fire & Cas. Co.*
156 Cal.App.4th 1469 (2009)                       25

*Elliott v. Geico Indem. Co.*
231 Cal.App.4th 789 (2014)                        45

*Garamendi v. Golden Eagle Ins. Co.*
127 Cal.App.4th 480 (2005)                    passim

*Ginns v. Savage*
61 Cal.2d 520 (1964)                              65

*Gunderson v. Fire Ins. Exch.*
37 Cal.App.4th 1106 (1995)                    30, 61

*Horace Mann Ins. Co. v. Barbara B.*
4 Cal.4th 1076 (1993)                                    63

*Jauregui v. Mid-Century Ins. Co.*,
1 Cal.App.4th 1544 (1991)                                46

*Jordan v. Allstate Ins. Co.*
116 Cal.App.4th 1206 (2004)                              38

*Legarra v. Federated Mut. Ins. Co.*
35 Cal.App.4th 1472 (1995)                               47

*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr.
Co.*
5 Cal.5th 216 (2018)                                     29

*MacKinnon v. Truck Ins. Exch.*
31 Cal.4th 635 (2003)                                    passim

*Ortega Rock Quarry v. Golden Eagle Ins. Co.*
141 Cal.App.4th 969 (2006)                               14

*Mancuso v. Southern Cal. Edison Co.*
232 Cal.App.3d 88 (1991)                                 44-45

*Montrose Chem. Corp. v. Admiral Ins. Co.*
10 Cal.4th 645 (1995)                                    13

*Ryman v. Sears, Roebuck & Co.*
505 F.3d 993 (9th Cir. 2007)                             66

*Sandbom v. BASF Wyandotte, Corp.*
674 So.2d 349 (La. App. 1996)                            26, 66

*Scottsdale Ins. Co. v. MV Transportation*
36 Cal.4th 643 (2005)                                    19, 61-62

*Standun, Inc. v. Fireman's Fund Ins. Co.*
62 Cal.App.4th 882 (1998)                                47-53

*State Dept. of State Hospitals v. Sup. Ct.*
61 Cal.4th 339 (2015)                                       44

*State of California v. Allstate Indem. Co.*
45 Cal.4th 1008 (2009)                            38, 41, 47-53

*The Villa Los Alamos Homeowners Assn v. State Farm
Gen'l Ins. Co.*
198 Cal.App.4th 522 (2011)                            passim


Federal Statutes and Rules

28 U.S.C. § 1291                                           12

28 U.S.C. § 1332                                           12

Fed. R. Civ. P. Rule 59(e)                         26-27, 47-48

Fed. R. Civ. P. Rule 60(b)                                27


State Statutes & Regulations

8 C.C.R. § 5144                                       24, 56-57

Cal. Civ. Code § 1644                                   37-38


Other

Croskey, et al., *Cal. Practice Guide: Ins. Litigation*
(The Rutter Group 2023)                              43, 56

Merriam-Webster Dictionary                               40

## INTRODUCTION

The infamous 2018 Camp Fire was the deadliest and most destructive wildfire in California's history. It obliterated the city of Paradise and a few smaller communities in Butte County. The State of California undertook a massive industrial effort to remove the wreckage. In that effort a truck driver named Richard Vargas hauled and dumped hundreds of loads of contaminated fire debris and, unfortunately, contracted a respiratory disease called sarcoidosis. Alleging permanent disability, Vargas sued the State and its prime contractor for negligence, claiming they repeatedly exposed him to clouds of polluted dust generated by moving and dumping the polluted debris. The prime contractor cross-sued its grading subcontractor, Brad Ingram Construction, claiming Ingram's work contributed to Vargas's condition.

This ensuring insurance dispute between Ingram and its insurer, Wesco Insurance Company, addresses whether Wesco owes a duty to defend Ingram against the prime contractor's cross-suit. Wesco sought a declaratory judgment that it owed no such duty. The district court granted Wesco's motion for summary judgment and entered judgment accordingly.

On appeal, the broad issue is whether the district court correctly found that Wesco's "Total Pollution Exclusion Endorsement"—which applies to injury "which would not have occurred in whole or part but for the actual [or] alleged

… dispersal … [or] release … of 'pollutants' at any time"—eliminated a duty to defend Ingram. The district court ruled correctly.

First, the underlying lawsuit hinges on "events commonly viewed as pollution, i.e., environmental pollution," as explained in the California Supreme Court's leading decision in *MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 653 (2003). Vargas did not, as claimed in Ingram's appellate brief, sue for "acts of ordinary negligence" unrelated to such pollution. *Id.* at 649.

Second, Vargas's pollution-caused injuries would not have occurred "but for" a "release" of pollutants, as required by the exclusion. The district court correctly decided that the clouds of dust at the cleanup project, generated whenever polluted debris was moved, transported, or dumped, were excluded releases.

The district court's ruling may be affirmed alternatively because—on a point not reached by the district court—excluded "releases" of pollution occurred by way of the Camp Fire itself. Vargas could not have contracted sarcoidosis without those releases, and Wesco's exclusion bars coverage for any injury that would not have occurred "in whole or in part but for" a release of pollutants "at any time." The exclusion requires a mere cause-in-fact connection between underlying injuries and any polluting event. Vargas plainly alleges a polluting event by way of the Camp Fire itself as well as through the dust clouds at the

11

cleanup project.

Third, the pollution released in the Camp Fire and later in clouds of toxic dust each qualified as an excluded "dispersal" of pollutants—another issue the district court did not reach in light of its conclusion that an excluded "release" had occurred. Because both the fire and the worksite operations caused the dissipation and dilution of pollutants over a wide area that was a cause-in-fact of Vargas's alleged condition, this aspect of the exclusion likewise bars coverage.

In challenging these points, Ingram's opening brief persistently refuses to confront binding California state cases enforcing exclusions like Wesco's to bar coverage for claims like Vargas's. Because the district court properly granted summary judgment, the judgment entered should be affirmed.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different states—Ingram is from California, Wesco is incorporated in Delaware and has its principal place of business in New York—with an amount in controversy exceeding $75,000.

This Court has subject-matter jurisdiction because Ingram appeals the declaratory judgment entered in favor of Wesco, which is a final decision of the district court under 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

1. <u>Facts</u>

   a. **The Wesco policy.**

Wesco's policy covered commercial general liability, including damages that the insured becomes legally obligated to pay because of "bodily injury" caused by an "occurrence" that takes place during the policy period. (2-ER-197 [declarations] & 229 [insuring agreement].)

As with other standard general-liability policies, Wesco's basic coverage form included a pollution exclusion, exclusion f. (2-ER-231.) But that standard exclusion was replaced and expanded by an endorsement (2-ER-267) that stated in relevant part as follows: [1]

THIS ENDORSEMENT CHANGES THE POLICY.
PLEASE READ IT CAREFULLY

**TOTAL POLLUTION EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

Exclusion **f.** under Paragraph **2., Exclusions of**

---

[1] Both the standard exclusion and the endorsement were drafted by the Insurance Services Office (or ISO). *See, Montrose Chemical Corp. v. Admiral Ins. Co*., 10 Cal.4th 645, 671 n. 13 (1995) (describing ISO).

13

**Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f.    Pollution**

> **(1)**   "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

* * *

The main commercial general liability form defined "pollutants" to "mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled."  (2-ER-243, definition 15.) California courts have repeatedly found that these "enumerated items listed" are "not exclusive" and instead that anything "within the broad definition of 'any solid, liquid, gaseous, or thermal irritant or contaminant' " is a "pollutant."  *Garamendi v. Golden Eagle Ins. Co.*, 127 Cal.App.4th 480, 485-486 (2005) (silica dust is a "pollutant); e.g., *Ortega Rock Quarry v. Golden Eagle Ins. Co.*, 141 Cal.App.4th 969, 981-990 (2006) (otherwise clean dirt and rocks illegally discharged into creek were "pollutants").

Ingram argued below that the project's "toxic dust" and "toxic debris" were not "pollutants." (2-ER-77 through 82; 40-43; 169-171.) The trial court disagreed. (1-ER-16 through 17.) Ingram's appellate brief now concedes these were "pollutants" subject to Wesco's endorsement. (AOB 19 [referring to "the wildfire which created the pollution"] & 42 [describing "the dust and debris" as "pollution [that] had already been 'released' by" the Camp Fire.)

### b. The *Vargas* complaint & Ceres's cross-complaint against Ingram.

After the Camp Fire, California's Department of Resources, Recycling and Recovery (often called CalRecycle) hired three prime contractors to clean up and remove the wreckage. (3-ER-353 [*Vargas* complaint], ¶ 1.) One prime contractor, Ceres, "was tasked with removal of debris from the unincorporated area outside of Paradise." (*Id.*) Ceres's project removed "more than 3.66 million tons of ash, debris, metal, concrete, and contaminated soil." (*Id.*)

Ceres hired subcontractors, including trucking company Garlow Transport. (*Id.* ¶ 2.) Garlow employed Vargas as a driver. (*Id.*) Vargas claimed that "[d]uring the summer of 2019" he "transported hundreds of truckloads of toxic debris from the site." (*Id.*) He alleged that, while other "[w]orkers located on site" were given "protective garments— i.e., Tyvek suits—and respirators … truckers like [Vargas] received no instruction or equipment for respiratory

protection." (*Id.*)  Every "time [Vargas's] truck was loaded, dust from the debris entered into the cab." (*Id.*)  After the bed was loaded, Vargas "would leave the truck and step out into the dust to cover the load with a tarp." (*Id.*)  "He would repeat this process to unload the debris, which again exposed him to the debris dust.  At no time did CalRecycle or Ceres take steps to protect workers like [Vargas], who only periodically came onto the site, from the toxic dust stirred up by their operations." (*Id.*)

Over that summer, Vargas averred, "his health deteriorated" and that fall "he was unexpectedly diagnosed with sarcoidosis, a disabling immune disease linked to exposure to environmental toxics" prevalent among "many workers at the World Trade Center 9/11 cleanup site … as a result of their exposure to toxins during that cleanup." (*Id.* at 353-354, ¶ 3.)  Vargas claims to be "disabled and unable to work as a result of this disease." (*Id.*)

Vargas also alleged that, "[b]ecause the debris was known to be a health hazard, CalRecyle required that Ceres and other prime contractors be certified for hazardous substance removal" and that CalRecyle understood "that the nature of the material being handled at the cleanup required added emphasis on safety." (*Id.* at 356, ¶ 15.)  CalRecycle allegedly "conducted daily oversight to make sure operations were safe" and made "public statements" asserting "that its overarching principles were to establish," inter alia, "the safety of its crews" and "the environment."

(*Id.*) Thus, "CalRecycle claims it had an expectation that on-site crews would wear the proper safety equipment, and it required decontamination zones at each site where on-site contractors suited up and suited off." (*Id.*) "CalRecycle's stated intent was that this would help prevent ash from getting into on-site crewmembers' trucks and going with them back home." (*Id.*)

Vargas also generally alleged that, "recognizing the hazardous nature of the debris and potential toxins that could become airborne during debris removal, CalRecycle set up air monitoring stations around the community for airborne toxins." (*Id.* at 357, ¶ 16.) Ceres and the other prime contractors "understood these obligations to prevent toxins from becoming airborne …." (*Id.* at ¶ 18.) Thus, "CalRecycle instituted special oversight to ensure cleanup operations went according to plan." (*Id.* at ¶ 19.)

Despite all that, and while on-site workers who directed" Vargas "were dressed in hazardous materials suits … [n]o similar protections were provided to [Vargas], nor was he told that he needed any type of respiratory protection." (*Id.* at 358, ¶ 22.) Thus, as the "workers loaded debris into" Vargas's "truck, they stirred up clouds of dust, which then came into" the "truck through its ventilation system." (*Id.*) Then, "[o]nce the truck was loaded, [Vargas] would have to step out into the dust to tarp the load," drive the load to a "designated waste facility," "remove the tarp, and dump the load, which again exposed him to dust." (*Id.*

at ¶ 23.) "With each visit to the debris removal site and each load of debris he hauled, [Vargas] was exposed to toxic dust from the debris." (*Id.* at ¶ 24.) Vargas claimed this continuing "exposure" to clouds of toxic dust "caused him to develop sarcoidosis." (*Id.* at 360, ¶ 33.)

Vargas thus sued Ceres and CalRecycle for damages on numerous causes of action. He did not sue Ingram.

Instead, Ceres sued Ingram via cross-complaint. (*Id.* at 367-380.) The cross-complaint contained no new allegations, but rather averred that "Ceres files this cross-action against Cross-Defendants herein, seeking indemnity from them for the claimed damages sought by Plaintiff" (*id.* at 367, ¶ 8) and referenced the *Vargas* complaint and attached it as an exhibit. (*Id.* at ¶¶ 7, 9.)[2] Ceres thus alleged that the cross-defendants "are responsible in whole or at least in part for [Vargas's] claimed damages for which [Vargas] seeks recovery in this action, and so [Ceres] therefore" sued Garlow and Ingram. (*Id.* at ¶ 9.)

Ingram conceded before this lawsuit that because Ceres's cross-complaint "does not contain any specific allegations regarding … the alleged occurrence or Vargas' alleged injury … the factual allegations pertinent to any alleged liability on [Ingram's] part for the injury claimed by Vargas must be found in the *Vargas* complaint." (2 ER 399.)

---

[2] The cross-complaint has two paragraphs number 9. This citation to paragraph 9 refers to the first; all others in this brief refer to the second.

In other words, whether the district court correctly determined Wesco owes no duty to defend Ingram against Ceres's cross-complaint depends "on a comparison between the allegations of the [*Vargas*] complaint and the terms of [Wesco's] policy." *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal.4th 643, 654 (2005). If this comparison confirms that "none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period" Wesco "does not have a duty to defend" and the underlying judgment must be affirmed. *Aerojet-General Corp. v. Transport Indem. Co.*, 17 Cal.4th 38, 59 (1997).

### c. Wesco declines to defend Ingram.

Ingram tendered Ceres's cross-complaint to Wesco. (3 ER 381-386.) Wesco declined the tender based on the Total Pollution Exclusion Endorsement. (*Id*. at 390-397.) Ingram challenged the decision and, through counsel, the parties debated coverage but were unable to resolve the dispute. (*Id*. at 399-446.)

## 2. Proceedings in the district court.

Wesco sued Ingram for a judicial declaration that Wesco owed no duty to defend *Vargas* because of the pollution exclusion endorsement. (3-ER-472 through 477.)

The parties filed cross-motions for summary judgment on a stipulated record. (2-ER-183 through 185 [stipulation]; 2-ER-186 through 3-ER-446 [evidence].) Wesco's briefs (2-

ER-122, 3-ER-447) contended that the exclusion eliminated any duty to defend Ingram in *Vargas*; Ingram argued that the exclusion could not categorically bar coverage for its potential liability and thus requested a declaratory judgment that a duty to defend exists.  (2-ER-104 through 121; 154-182.)  The district court denied Ingram's motion and granted Wesco's.  (1-ER-10 through 23.)

The district court's order focused on "three primary issues" implicated by Wesco's exclusion and the *Vargas* allegations.  (*Id*. at 15:26.)  "First, is the toxic dust that allegedly caused Vargas's sarcoidosis a 'pollutant' as defined by the policy?  Second, was his injury caused by the pollutant's 'release' or 'dispersal'?  Third, do the allegations amount to an 'act of pollution,' which is covered by the exclusion, or an 'ordinary act[] of negligence involving toxic chemicals,' which is not."  (1-ER-15 through 16, quoting *MacKinnon*, 31 Cal. 4th at 639, 654.)

The district court first concluded that the injury-causing "toxic dust" was a "pollutant" (1-ER-16 through 17) because "[a] layperson would interpret 'toxic dust' to be an irritant or contaminant," the general standard by which something is deemed a "pollutant."  (*Id*. at 17:45.)  Ingram's opening brief now concedes the toxic dust was a "pollutant." (AOB 19 ["the wildfire which created the pollution"] & 42 ["the dust and debris" was "pollution [that] had already been 'released' by" the fire].)

The district court next concluded that the dust clouds were an excluded "release" of pollutants as the exclusion requires. (1-ER-18 through 19.)[3] The court first acknowledged MacKinnon's general observation that common understandings of a "release" typically " 'connote some sort of freedom from containment.' " (*Id.* at 18:6-11, quoting *MacKinnon*, 31 Cal.4th at 651.) The court then turned to *The Villa Los Alamos Homeowners Assn v. State Farm Gen'l Ins. Co.*, 198 Cal.App.4th 522 (2011), which enforced a pollution exclusion after asbestos was "released" when a contractor scraped ceilings at a condominium complex and the asbestos blanketed the grounds. The district court found it significant that, in *Villa Los Alamos,* "the asbestos 'became airborne and spread' throughout the building and onto its exterior grounds," and also that the *Villa Los Alamos* court "noted that widespread dispersal was not necessary for a release to occur, as there was 'no safe level of exposure to asbestos.' " (1-ER-18, quoting *Villa Los Alamos*, 198 Cal.App.4th at 540.)

The district court then turned to "Ingram's overarching argument … that in order for a pollutant to be released, it must move from a contained to an uncontained state under *MacKinnon*, and because the toxic dust was never contained,

---

[3] Because it concluded a "release" occurred, the district court declined to address Wesco's alternative argument that Vargas's allegations separately implicated the exclusion's "dispersal" causal mechanism. (1-ER-19 [footnote 7].)

it could not be released." (1 ER 18.) But Ingram's argument had merely cobbled together a series of dictionary definitions stemming from *MacKinnon*'s "freedom from containment" comment to claim the dust from the debris could never be released because it was on the ground in the outside environment. (*Id*.) The court rejected this argument because "the dictionary definitions Ingram offers are not dispositive" (*id*. at 19), an observation born from the *MacKinnon* court's admonition that courts cannot "make a fortress out of the dictionary" to rigidly construe pollution exclusions. 31 Cal.4th at 649 (cleaned up).

Instead, the district court reasoned, Vargas's complaint "mirror[ed] the release of the asbestos in *Villa Los Alamos*" in all material respects. (1-ER-19.) Workers "[m]oving the debris" that stirred up the dust clouds "is akin to scraping the ceiling" because "both caused the pollutant at issue to become airborne and spread"—in *Villa Los Alamos* "inside and around the apartment building" and in *Vargas* "around and inside Vargas's truck." (*Id*.) Too, "like the asbestos in *Villa Los Alamos*, the allegations in Vargas's complaint indicate that there was no safe level of exposure to the toxic dust, as shown by the protective gear that workers wore and air monitoring stations located around the worksite." (*Id*.)

Thus, "[w]hether the dust was contained within the debris or sitting on top of it"—as Ingram had argued—"is a distinction without a difference" because "moving the debris (and thereby causing the dust to become airborne and

spread) allegedly caused Vargas's injury, as did scraping the ceiling (and thereby causing the asbestos to become airborne and spread) in *Villa Los Alamos*. Accordingly, a layperson would consider the toxic dust 'released' as alleged in Vargas's complaint." (*Id*.)

Having concluded the dust was a pollutant "released" by the operations of Ingram and others at the cleanup project, the district court turned to "[t]he critical question set forth in *MacKinnon*" of "whether the alleged injury arises from an event 'commonly thought of as pollution'—i.e., 'environmental pollution' or an 'act of pollution.' " (1-ER-19, quoting 31 Cal.4th at 653-654.) The court first highlighted how *MacKinnon* declared "environmental pollution" different from "ordinary acts of negligence involving toxic chemicals" such as the spraying of pesticides to kill yellow jackets at an apartment building resulting in a tenant's death in that case. (1-ER-19—20.)

The district court also noted, however, that the *MacKinnon* court "acknowledged that 'terms such as … 'environmental pollution,' are not paragons of precision, and further clarification may be required.' " (*Id*. at 20, quoting 31 Cal.4th 654.)

Because *MacKinnon* provided no guidance beyond the spraying of pesticides at hand, the district court returned to *Villa Los Alamos* and analogized that case's conclusion that "releasing asbestos by scraping ceilings was not akin to an 'ordinary' act of spraying pesticides" to the allegations in

*Vargas.* (1-ER-20.) In *Villa Los Alamos*, the insured and its contractors all knew "that the ceiling contained asbestos." (*Id.*) Likewise in *Vargas*, where "CalRecycle and the contractors, including Ceres, knew that the debris was hazardous and that airborne toxins were concerns, as indicated by the decontamination zones, air monitoring stations, and workers who wore protective equipment." (*Id.* at 21.) In the district court's view, this protective equipment "was particularly important" because it would lead a "reasonable layperson" to regard "the activities that released the dust as hazardous." (*Id.*)

Then there was "the strict regulation of 'renovation or demolition activity which disturbs asbestos-containing constructional materials," which rendered it " 'highly unlikely that a homeowner, on his or her own, could remove acoustical 'popcorn' ceiling containing asbestos without violating a myriad of laws.' " (*Id.*, quoting *Villa Los Alamos*, 198 Cal.App.4th at 538.) The same was true in *Vargas*, where "the cleanup effort was subject to 'regulations to ensure appropriate worker protections,' including" 8 CCR § 5144 "aimed at preventing 'atmospheric contamination.' " (1-ER-21, quoting *Vargas* complaint ¶ 30 & 8 CCR § 5144.)

The district court also cited the point from *Villa Los Alamos* that "the spread of the asbestos … 'instantly became a health hazard' upon release" such that it " 'would comport with the common understanding of the word 'pollute.' " (1-ER-21, quoting 198 Cal.App.4th at 540.) "[L]ike the asbestos

in *Villa Los Alamos*," said the district court, "the efforts to prevent workers' exposure to the dust—as shown by the protective equipment and air monitoring stations—indicates that there was no safe level of exposure to the toxic dust." (1-ER-21.)

"Taking all of this into account," the district court concluded "a reasonable layperson would understand that the release of toxic dust clouds during the removal of debris left behind by a wildfire was an act of pollution rather than an ordinary act of negligence." (*Id.*) Releasing the dust "during a massive cleanup effort is not the same as spraying pesticides around an apartment building to kill yellow jackets." (*Id.*) Instead, "[i]t is more akin to the silica dust that was an 'incidental byproduct' of the industrial operation"—sandblasting—"in *Garamendi*, the dust and odor that spread to other properties in *Cold Creek*,[4] and the asbestos that was released in *Villa Los Alamos*—all of which were deemed acts of pollution falling within pollution exclusions." (*Id.*)

The court then rejected two of Ingram's ancillary arguments. The first was Ingram's claim that "the pollution exclusion does not apply to toxic exposure in the workplace" because "*Garamendi* appears to foreclose this." (*Id.* at 22.)

---

[4] *Cold Creek Compost, Inc. v. State Farm Fire & Cas. Co.*, 156 Cal.App.4th 1469, 1482 (2009) (odors from composting operation, even though not "toxic or particularly harmful," triggered pollution exclusion).

*Garamendi* had enforced the same exclusion to claims of
silica injuries suffered during employment and "Ingram cites
no California authority countering *Garamendi*." (*Id*.)

The second was Ingram's argument "that the pollution
exclusion does not apply to toxic exposure that occurs during
the remediation of hazardous substances." (*Id*.) Ingram
relied entirely on a Louisiana case, *Sandbom v. BASF
Wyandotte, Corp.*, 674 So.2d 349 (La. App. 1996), which the
district court found both nonbinding and irrelevant because
*Sandbom* had concluded merely that no "release" of
pollutants had been implicated where the plaintiff was
injured " 'by entering the area' where chemicals were
contained." (1-ER-22.) *Sandbom* "did not, as Ingram
asserts, declare that pollution exclusions did not apply to
cleanup efforts" like the one alleged in *Vargas*. (*Id*.)

The district court therefore granted Wesco's motion
and denied Ingram's cross-motion because "Wesco has shown
that the underlying claim cannot fall within the policy
coverage because the alleged acts giving rise to Vargas's
injury—the release of toxic dust—constitute environmental
contamination under *MacKinnon* and its progeny." (*Id*.)

After the district court entered judgment (1-ER-9),
Ingram moved to alter the judgment under F.R.Civ.P. Rule
59(e), claiming "manifest errors of law." (2-ER-71.) The
district court denied Ingram's motion in a seven-page order
(1-ER-2) and Ingram appealed. (3-ER-489.)

## STANDARDS OF REVIEW

This Court "can affirm the decision[s] of the district court on any ground supported by the record, even one not relied on by that court." *Northwest Environmental Defense Center v. Brown*, 640 F.3d 1063, 1080 (9th Cir. 2011), reversed on other grounds at 568 U.S. 597 (2013).

Turning first to the summary-judgment order, the record was stipulated (2-ER-183 through 3-ER-446) and the only legal issues decided were the district court's interpretation of state contract law. That order is reviewed de novo. *Winans v. State Farm Fire & Cas. Co.*, 968 F.2d 884, 886 (9th Cir. 1992).

The opening brief claims the district court's order denying Ingram's Rule 59(e) motion is also reviewed de novo because it is a "district court's denial of a motion to alter the summary judgment." (AOB 24, citing *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1020 (9th Cir. 2001).) But *Stites* involved a motion under Rule 60(b). Instead, this Court reviews "for abuse of discretion the district court's ruling on a Rule 59(e) motion" like Ingram's. *Kaufmann v. Kijakazi*, 32 F.4th 843, 847 (9th Cir. 2022). Ingram never argues that the district court erred, let alone abused discretion, in denying the Rule 59(e) motion. Ingram has waived any challenge to that order and may not attack it for the first time in a reply brief. *McMillan v. U.S.*, 112 F.3d 1040, 1047 (9th Cir. 1997).

## SUMMARY OF ARGUMENT

The broad issue is whether the district court correctly found that Wesco's "Total Pollution Exclusion Endorsement"—which applies to " '[b]odily injury' … which would not have occurred in whole or part but for the actual [or] alleged … dispersal … [or] release … of 'pollutants' at any time" (2-ER-267)—precluded a duty to defend. The judgment was legally correct for the following reasons.

First, Vargas's suit turns on allegations of negligence during a regulated industrial operation to remediate an environmental disaster. Such claims do not implicate "acts of ordinary negligence" distinct from environmental pollution and thus capable of evading a pollution exclusion. *MacKinnon*, 31 Cal.4th at 649. Instead they reflect acts of negligence involving pollutants that are "commonly thought of as environmental pollution," the very reason for a pollution exclusion like Wesco's. *American Cas. Co. of Reading, PA v. Miller*, 159 Cal.App.4th 501, 515 (2008).

Second, Vargas's allegations that he was injured by clouds of toxic dust implicate a "release" or a "dispersal" of pollutants under Wesco's exclusion. Both causal mechanisms describe the dust clouds created at the removal sites, and again the clouds created when Vargas dumped loads of the debris contained within his truck bed. Either set of polluting events suffices to exclude coverage for the underlying lawsuit.

Third, the phrase "but for" in Wesco's exclusion

imports a cause-in-fact standard because "tort principles govern the question of causation" in policies of liability insurance. *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal.5th 216, 223 (2018). *Any* "release" or "dispersal" of pollutants that amounts to an actual or alleged cause-in-fact of Vargas's injuries triggers this exclusion and eliminates a duty to defend. That means the pollution created initially by the Camp Fire or by the subsequent acts of pollution at the cleanup operation, alone or in combination with one another, bar coverage for Vargas's lawsuit.

Ingram's appellate brief misunderstands these dispositive points, claiming that the Camp Fire's releases and dispersals in clouds of dust did not amount to a "release." But Ingram cites only rules derived from a dictionary, violating the *MacKinnon*'s court's admonition not to make "a fortress out of the dictionary." 31 Cal.4th at 649.

Ingram then mistakenly invokes a rule governing out-of-date forms of pollution exclusions that excepted "sudden and accidental" discharges. The sudden-and-accidental rules have no bearing on this case involving a pollution exclusion under which the accidental or intentional nature of polluting events makes no difference.

Ingram also fails to confront, and thus concedes, the exclusion's "but for" language requiring a mere cause-in-fact connection between an excluded release and the claimed injuries. Instead, Ingram broadly speculates that Vargas's sarcoidosis may have non-pollutant origins despite the

complaint's clear allegations that pollutants caused the sarcoidosis. Such speculation is legally improper in the first instance. *Gunderson v. Fire Ins. Exch.*, 37 Cal.App.4th 1106, 1114 (1995). Equally important, Ingram's speculation ignores that, if Ingram succeeds in disproving that the pollution here contributed to Vargas's sarcoidosis, Ingram would suffer no liability at all and Wesco would have nothing to indemnify. That is, the only potential for liability Ingram actually faces—based on pollution—is excluded. *All Green Electric, Inc. v. Security Nat'l Ins. Co.*, 22 Cal.App.5th 407, 413-414 (2018). Finally, Ingram's speculation ignores the exclusion's phrase "in whole or in part," which means Ingram's underlying liability would be excluded even if causes beyond pollution contributed to Vargas's sarcoidosis. *24th & Hoffman Investors, LLC v. Northfield Ins. Co.*, 82 Cal.App.5th 825, 838-840 (2022).

Ingram last claims that pollution exclusions cannot apply to on-the-job injuries like Vargas's, despite the controlling *Garamendi* decision that enforced an identical exclusion to bar coverage for such an on-the-job lawsuit.

The judgment should be affirmed.

## ARGUMENT

1. **The *Vargas* lawsuit involved no "ordinary acts of negligence" capable of evading Wesco's pollution exclusion.**

In its 2003 decision in *MacKinnon*, the California

Supreme Court observed that a general-liability policy like Wesco's "establishes a reasonable expectation that the insured will have coverage for ordinary acts of negligence." 31 Cal.4th at 649. So pollution exclusions usually reach "events commonly thought of as pollution, i.e., environmental pollution" but not a "localized toxic accident occurring in the vicinity of intended use." *Id.* at 653. In *MacKinnon,* the insured landlord hired a pest-control company that negligently sprayed its pesticide in its performance of the "intended use" the toxic substance, a narrow setting the court found to fall outside the exclusion. *Id.*

This Court's task is thus to decide whether Vargas's allegations—that he was negligently exposed to clouds of polluted dust without proper safety warnings or equipment during the cleanup project—suggest Ingram's liability for excluded "environmental pollution," *MacKinnon*, 31 Cal.4th at 653, or rather for mere "ordinary acts of negligence?" *Id.* at 649.

Here, Vargas alleged that the Camp Fire toxic-cleanup project was heavily regulated due to its hazardous nature, and inadvertently injured Vargas by exposing him to clouds of toxic dust stirred up at the project. This qualified the toxic-cleanup project as "environmental pollution" within *MacKinnon*, *id.* at 653-654. In much the same way, California law recognizes that environmental contamination occurs when toxic asbestos products are initially "installed"

in a building and also "at any time asbestos fiber or material is released … into the air or on surfaces of the building, and when settled releases are disturbed and reentrained into the air." *Armstrong World Industries, Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal.App.4th 1, 96 (1996).

Here, too, in destroying the town of Paradise and surrounding forests, the Camp Fire released pollutants and the State's later toxic-cleanup operation "disturbed and reentrained" those pollutants "into the air," *id.*, in the form of toxic dust—"each" is thus properly viewed as "an act of contamination" because each made the surrounding environment "more hazardous." *Id.* at 98. So too in the 2011 decision in *Villa Los Alamos,* where the court noted that asbestos contamination in an apartment complex occurred "upon release [when] the asbestos fibers instantly became a health hazard." 198 Cal.App.4th at 540.

The district court rejected Ingram's argument that operational negligence at the project amounted to ordinary negligence because the *Vargas* allegations confirm the State's toxic-cleanup project was inherently dangerous and subject to a maze of environmental and safety regulations. (1-ER-20-21.) The district court analogized the project to the asbestos-removal project in *Villa Los Alamos,* which that court found involved no "ordinary act of negligence." 198 Cal.App.4th at 537. Here, in other words, each time the cleanup operation "disturbed and reentrained" the Camp Fire pollutants "into the air" as toxic dust clouds, "an act of

contamination" occurred because it made the surrounding environment and the project "more hazardous." *Armstrong World Industries,* 45 Cal.App.4th at 96, 98.

On appeal, Ingram recasts the "ordinary negligence" theory into a claim that Vargas's lawsuit cannot be excluded because it includes theories in the style of product liability, i.e., "failure to warn or failure to provide protective equipment" to Vargas. (AOB 29). But the 2005 decision in *Garamendi* enforced a pollution exclusion identical to Wesco's to bar coverage for silica-injury lawsuits advancing the sort of defective-product and failure-to-warn theories of liability that Ingram now invokes on appeal. The *Garamendi* court enforced the exclusion because "the injuries would not have occurred but for the discharge of the pollutant," silica. 127 Cal.App.4th at 488. "Absent some other provision in the policy excepting product liability claims from the exclusion, the exclusion applies." *Id.*

At bottom, the negligence in the State's toxic-cleanup project as alleged in *Vargas* "cannot be lumped in with the 'ordinary' act of spraying pesticides" as occurred in *MacKinnon* or with similar routine acts of negligence. *Villa Los Alamos*, 98 Cal.App.4th at 537. As with the asbestos-removal project found excluded in *Villa Los Alamos,* everything about the toxic-cleanup project alleged in *Vargas* suggests environmental pollution traditionally understood. The district court's sound ruling in that respect should be affirmed.

2. **Excluded "releases" of pollutants were causes in fact of Vargas's sarcoidosis.**

Wesco's pollution exclusion applies to injuries "which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, … release or escape of 'pollutants' at any time." (2-ER-267.) The district court's ruling enforcing the exclusion focused on the causal mechanism of a "release." "Release" in this context "connote[s] some sort of freedom from containment." *MacKinnon*, 31 Cal.4th at 651 (cleaned up).

Here, the district court concluded that the *Vargas* action turns on excluded releases of pollutants because "[t]he toxic dust left behind by the" Camp Fire was a "pollutant" and "[i]t was released when workers loaded and unloaded debris into [Vargas's] truck that hauled it out of the burn zone." (1-ER-10.) As discussed below, the district court was correct and its ruling should be affirmed.

a. **The district court was correct that clouds of toxic dust amounted to a "release" of pollutants.**

The district court found excluded "releases" because the *Vargas* allegations "mirror the release of the asbestos in *Villa Los Alamos*." (1-ER-19.) The *Villa Los Alamos* court explained that "[w]hen asbestos is disturbed by construction and related activities, the result is commonly referred to as a

'release' of asbestos." 198 Cal.App.4th at 536-537. The court noted that asbestos products "release asbestos into the air if they are handled in a manner that disturbs them because this causes the asbestos to become airborne." *Id*. The disputed negligence in *Villa Los Alamos* amounted to "environmental pollution" because it involved a contractor "scraping … acoustic ceiling tiles" and causing "the release of asbestos fibers into the air." *Id*. at 540.

Likewise here, Vargas alleged that, as the cleanup project "workers loaded debris into his truck, 'they stirred up clouds of dust, which then came into [his] truck through its ventilation system.' " (Order, 1-ER-19, quoting *Vargas* complaint, 3-ER-358, ¶ 22.) "Moving the debris," reasoned the district court, "is akin to scaping the ceiling" because in *Villa Los Alamos* "the asbestos spread inside and around the apartment building" and in *Vargas* "the toxic dust spread around and inside Vargas's truck." (*Id*., citing *Vargas* complaint, 3-ER-358, ¶ 23.) "Moreover, like the asbestos in *Villa Los Alamos*, the allegations in Vargas's complaint indicate that there was no safe level of exposure to the toxic dust, as shown by the protective gear that workers wore and air monitoring stations located around the worksite." (1-ER-19, citing *Vargas* complaint, 3-ER-357, ¶¶ 15-16.)

The district court then addressed Ingram's argument (2-ER-107-108) that *MacKinnon*'s "freedom from containment" rationale means Vargas alleged no "release" based on strict dictionary definitions of the *MacKinnon*

concept of "contain." The district court found the definitions "not dispositive" and instead that "[w]hether the dust was contained within the debris or sitting on top of it is a distinction without a difference" because "moving the debris" made the dust "airborne and spread … as did scraping the ceiling (and thereby causing the asbestos to become airborne and spread) in *Villa Los Alamos*." (1-ER-19.) Rejecting Ingram's argument, the district court found that "a layperson would consider the toxic dust 'released' as alleged in Vargas's complaint." (*Id*.)

On appeal, Ingram first claims the district court erred because it found "that the toxic dust … was 'contained' in or on the wildfire debris" and released because it "was disturbed by Ceres and Ingram." (AOB 38, repeated 39-40.) But the district court did not so rule; the court never required that an insured itself cause the excluded "release" of pollutants. Instead, the district court concluded correctly that, because "workers" at the project stirred up dust clouds, pollutants went airborne and were "released" under a routine understanding of that term. (2-ER-107—108.)

The opening brief next contends that Ingram was not responsible for fire dust and debris "in their natural state" and "subject to natural elements, including wind." (AOB 40.) But the point makes no difference to Wesco's exclusion, under which Ingram's responsibility for pollutants is irrelevant. Rather, the pollutants need only have been a case-in-fact of the claimant's injury. Factually, moreover,

the point makes no sense here because fire debris and "dust from the debris" (3-ER-353 [*Vargas* complaint], ¶2) have no "natural state."

Ingram then claims to show "the alleged toxins were never contained" at the cleanup project (AOB at 40) based on the same strict definition of "contain" as a verb (*id*. at 40-41), as Ingram argued in the district court.  Ingram postulates that because nothing was "contained" at the project nothing could have been "released;" the only "releases," Ingram says, were those caused directly by the Camp Fire that Ingram claims are irrelevant to coverage.  (*Id*. at 42 ["The pollution has already been 'released' by an act of nature … the Camp Fire, a natural event"].)

Ingram thus ignores *MacKinnon*'s caution against making "a fortress out of the dictionary."  31 Cal.4th at 649 (cleaned up).  While "examination of various dictionary definitions will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context," so a court instead "must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language."  *Id*.

*MacKinnon* itself thus grounds the district court's ruling that "a layperson would consider the toxic dust 'released' as alleged in Vargas's complaint" based on its similarities with *Villa Los Alamos*.  (1-ER-19.)  The district court interpreted the words of Wesco's exclusion in their

"ordinary and popular sense" (Cal. Civ. Code § 1644) "according to the plain meaning which a layman would ordinarily attach to them." *Jordan v. Allstate Ins. Co.*, 116 Cal.App.4th 1206, 1214 (2004). It determined "the objectively reasonable expectations of" Ingram in context, based on the policy language, *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1265 (1992), and thus rejected Ingram's "strained or absurd interpretation," *Jordan*, 116 Cal.App.4th at 1214, that injuries caused by toxic dust clouds from workers negligently handling pollutants in an environmental disaster zone somehow evade an exclusion for environmental pollution.

Ingram nonetheless insists that, in some pollution-exclusion decisions, "the pollutants were stored in such a manner that they were protected from disturbance, until the insured released them." (AOB 42.)[5] Ingram thus continues to disregard the analogous asbestos setting where "settled releases are disturbed and reentrained into the air," which has been held to be "an act of contamination" because it "makes the building more hazardous." *Armstrong World Industries,* 45 Cal.App.4th at 96, 98; e.g., *Villa Los Alamos*,

---

[5] These citations do not support Ingram's claim that the insured must cause an excluded release. Ingram cites *Villa Los Alamos*, where the insured's contractor, not the insured, released the asbestos. Ingram also cites *State of California v. Allstate Indem. Co.*, 45 Cal.4th 1008 (2009), where rainstorms, not the insured, caused chemical waste to overflow from containment ponds.

198 Cal.App.4th at 540 (asbestos was "released" when it went airborne and "instantly became a health hazard"). The same is true of the State's toxic-cleanup project, which is why Vargas alleged lack of air-contamination prevention under applicable regulations. (3-ER-359, ¶ 30, et seq.) In claiming that no release occurred because the pollutants were not "protected from disturbance," not "stored within a protective barrier or confined in a structure," and not "restricted or limited in any way," Ingram cites nothing more than restrictions Ingram alone devised drawing on a dictionary definition of a form of the word *MacKinnon* used ("contain") when describing the exclusion term "release." (AOB 41.)

California courts normally disdain an interpretation like Ingram's, smacking of "abstract philology," as "defective as a matter of policy interpretation because it disregards the context." *Bank of the West*, 2 Cal.4th at 1265. Here, Ingram was sued for negligent handling of polluted materials at a heavily-regulated toxic-cleanup project. To evade Wesco's exclusion for injuries caused by environmental pollution through strained tactics would generate just the "absurd result" the *MacKinnon* court instructed judges in California to avoid. 31 Cal.4th at 652.

Such an outcome would be wrong even under Ingram's own made-up rules requiring pollution to have been "protected from disturbance" or "restricted or limited in any way." Using the same dictionary Ingram used, any

objectively reasonable insured would understand airborne "clouds" (*Vargas* complaint, 3-ER-358, ¶¶ 22, 24) [6] of polluted "dust from the debris" [7] (*id.* at 353, ¶ 2) as a "release"[8] from the millions of tons of "ash, debris, metal, concrete, and contaminated" soil removed. (*Id.* at ¶ 1.) When Ingram claims that this result "is absurd because the dust and the debris were one and the same" (AOB 44), Ingram denigrates Vargas's logical allegation that the dust came "from the debris." (3-ER-353, ¶ 2.) Of course the toxic dust was liberated in clouds from earth-bound debris and so "released."

Ingram, moreover, fails to grasp Vargas's allegation that, "[o]nce [his] truck was loaded," he would place a tarp over the load, "get back into his truck and drive it to the designated waste facility," and then "exit his truck, remove the tarp, and dump the load, which again exposed him to dust." (3-ER-358, ¶ 23.) This is the "process" Vargas "repeated … for hundreds of loads throughout June and July 2019," alleging that with "each load of debris he hauled, [he] was exposed to toxic dust from the debris." (*Id.* at ¶ 24.) He

---

[6] a "visible mass of minute particles suspended in the air" (merriam-webster.com/dictionary/cloud)

[7] "fine particles of matter (as of earth)" or "the particles into which something disintegrates" (merriam-webster.com/dictionary/dust)

[8] "the act or an instance of liberating or freeing" (https://www.merriam-webster.com/dictionary/release)

claimed this exposure "to clouds of toxic dust during the loading and unloading of his truck" is what "caused him to develop sarcoidosis." (*Id*. at 359-360, ¶¶ 32-33.)

Even if Ingram were correct that Vargas was not exposed to any "release" of pollutants during the loading process because those pollutants were uncontained—though Ingram is wrong—those pollutants were unambiguously "placed into containment" when loaded and tarped in Vargas's truck bed. *State of California,* 45 Cal.4th at 1020. Every time Vargas dumped those loads he released the pollutants; Vargas claims those releases in unloading were a but-for cause of his sarcoidosis and sued accordingly. *Id*. at 1020-1021 (citing *MacKinnon*'s to find a second "discharge, dispersal, release, or escape" after pollutants had been "placed into containment").

Nothing else is needed for Wesco's cause-in-fact exclusion to bar coverage for the underlying lawsuit. The district court's determination that the clouds of dust to which Vargas was exposed at each stage of his work each amounted to a "release" was legally correct and should be affirmed.

### b. Wesco's exclusion independently applies because the Camp Fire itself released pollutants that were a "but for" cause of Vargas's sarcoidosis.

Ingram's opening brief pervasively claims that Wesco's exclusion cannot apply unless Ingram's own actions caused a

"release" of pollutants.  Ingram says:

- "Wesco denied coverage based on the policy's pollution exclusion which bars coverage for bodily injury resulting from *the insured's* 'discharge, dispersal, seepage, migration, release or escape' of a pollutant" (AOB 8, italics added);
- "Vargas' complaint does not allege that Ceres or *Ingram created*, dispersed, or released any alleged pollutant or toxic material" (*id*. at 15, italics added);
- Wesco's exclusion cannot apply absent "an *act by the insured* via one of the specified causal mechanisms that creates something objectionable or unwanted" (*id*. at 22, italics added);
- "The classic application of the pollution exclusion applies in cases where *the insured created* the pollution" (*id*. at 39, italics added); and
- "[U]nder *MacKinnon*, 'release' of a pollutant cannot occur unless a containment of a pollutant first existed, from which it was subsequently freed from 'containment' *by the insured*." (*Id*. at 39, italics added.)

From these premises, Ingram claims error because the pollution described in *Vargas* "was, indisputably, created by the Camp Fire, *a natural event*," not "an industrial or human-made event." (AOB 33, emph. orig.)  Ingram repeats this over and over (*id*. at 39-40, 44) to buttress the opening

brief's claim that "[n]o reasonable insured would consider toxic dust and debris left behind by a fire to be considered 'industrial pollution' within the meaning of Wesco's exclusion." (*Id*. at 34.)

Wesco's preceding point shows that this theory is wrong in the first instance. Vargas sued Ceres for negligently causing his sarcoidosis by kicking up clouds of toxic dust and Ceres cross-sued Ingram as "responsible in whole or at least in part for" that conduct. (3 ER 370, ¶ 9.) This is excluded "environmental pollution" under *MacKinnon* and it is the claimed cause-in-fact of Vargas's disease. Ingram can have no objectively reasonable expectation of coverage for such claims.

But Ingram also makes up the claimed rule that a "release" under a pollution exclusion must be an act *by the insured*. Nothing in the language of the exclusion so requires, nor does *MacKinnon* suggest anything of the sort. Under California law, "an insurer is free to limit the risk it assumes by contract, and [courts] may not rewrite that contract for any purpose." *24th & Hoffman Investors, LLC v. Northfield Ins. Co.*, 82 Cal.App.5th 825, 839 (2022).

Recall that Wesco's exclusion (2-ER-267) supersedes the original pollution exclusion (2-ER-231) and thus "broadens the causation element" by replacing the phrase "arising from" with "but for." Croskey, et al., *Cal. Practice Guide: Insurance Litigation* (The Rutter Group 2023), Ch. 7H-I, § 7:2085. By using "arising from" the original

exclusion barred coverage for injuries "originating from, having its origin in, growing out of, … flowing from, … incident to, or having connection with" a pollutant "release." *Los Angeles Lakers, Inc. v. Federal Ins. Co.*, 869 F.3d 795, 801 (9th Cir. 2017) (ellipses orig.). Who or what caused the release thus would have been irrelevant under the original clause. E.g., *Villa Los Alamos* (excluded release caused by insured's contractor, not the insured).

The same is necessarily true of Wesco's "far broader" endorsement that "shifts the focus to injuries that would not have occurred 'but for' the discharge of pollutants." *Garamendi*, 127 Cal.App.4th at 487-488. Wesco's endorsement thus requires only that a "release" be a "cause in fact," that is, "a necessary antecedent of" Vargas's sarcoidosis. *State Dept. of State Hospitals v. Sup. Ct.*, 61 Cal.4th 339, 352 (2015). Under "but for" causation principles, when a "defendant's negligence" (like that that alleged here in the cleanup operation) "combines with an 'act of God'" (like the Camp Fire) "to cause injury, liability will result." *Mancuso v. Southern Cal. Edison Co.*, 232 Cal.App.3d 88, 103-104 (1991).

Thus, under the "but for" causation standard in Wesco's exclusion, the release of pollutants caused by the Camp Fire itself sufficed to exclude any liability that Ingram might incur. Importantly, Ingram concedes the Camp Fire caused pollution through countless discrete "releases." (AOB 42 ["The pollution had already been 'released' by … the

Camp Fire"].)  Those releases formed a necessary antecedent of Vargas's injuries, and they remained a necessary antecedent when combined with the alleged negligence at the cleanup project.  Each step was "an act of contamination." *Armstrong World Industries,* 45 Cal.App.4th at 96.  Under the "but for" causation rule, when a "defendant's negligence combines with an 'act of God' to cause injury, liability will result." *Mancuso,* 232 Cal.App.3d at 103-104.

In short, because Vargas could not have contracted sarcoidosis had the Camp Fire never happened, the fire's release of pollutants was a cause-in-fact of his disease. Wesco's exclusion "conspicuously, plainly, and clearly apprises" Ingram that such claims "will not be covered." *MacKinnon*, 31 Cal.4th at 649.  This Court may affirm the judgment as legally correct on this alternative ground even though the district court (correctly) granted summary judgment to Wesco on worksite "release" grounds alone. *Northwest Environmental Defense Center,* 640 F.3d at 1080.

Lacking any text-based argument, Ingram finally invokes the doctrine of reasonable expectations.  Ingram claims "[n]o reasonable insured would consider toxic dust and debris left behind by a wildfire to be" pollution barred by Wesco's exclusion.  (AOB 34.)  But the reasonable-expectations doctrine "comes into play *only* where there is an ambiguity in the policy," *Elliott v. Geico Indem. Co.*, 231 Cal.App.4th 789, 803 (2014) (emph. orig.), and Ingram has

identified no ambiguity in light of the policy "as a whole." *MacKinnon*, 31 Cal.4th at 648. Nor has Ingram shown that the exclusion "is capable of two or more constructions, both of which are reasonable" as is necessary to find ambiguity in the first instance. *Id*.[9] Ingram likewise fails to show that its expectation of coverage is "objectively reasonable," *Bank of the West, supra* 2 Cal.4th at 1265, as "defined by [Wesco's] policy language." *Jauregui v. Mid-Century Ins. Co.*, 1 Cal.App.4th 1544, 1552 n. 1 (1991).

Nor can Ingram do so. Wesco's endorsement, prominently labeled "Total Pollution Exclusion Endorsement," unambiguously says that no coverage exists when a "release" of " 'pollutants' at any time" is, irrespective of who or what caused it, a necessary factual predicate of a third-party's claimed injuries. (2-ER-267.) This accords with *MacKinnon*'s instruction that an insurer may exclude even "acts of ordinary negligence" involving pollutants if its pollution exclusion does so "conspicuously, plainly and clearly." 31 Cal.4th at 649. Wesco's does, so even if Vargas had sued for "ordinary negligence" instead of the acts of "environmental pollution actually alleged in his complaint, Wesco's exclusion would bar coverage. That result would be

---

[9] The opening brief's Summary of Argument section says "Ingram contends that an ambiguity in the application of [the] term" release "arises because Ingram's interpretation of 'release' an application [sic] is also reasonable." (AOB 22.) But the brief never says what Ingram's interpretation is or advances the promised argument.

proper under the rule "[a]n insurer may select the risks it will insure and those it will not, and a clear exclusion will be respected." *Cal. Traditions, Inc. v. Claremont Liability Ins. Co.*, 197 Cal.App.4th 410, 418 (2011).

At bottom, Ingram's claims of error ask the Court to "rewrite [Wesco's] insurance contract or force a conclusion to exact liability where none was contemplated." *Legarra v. Federated Mut. Ins. Co.*, 35 Cal.App.4th 1472, 1480 (1995) (cleaned up). Ingram's *subjective* expectation of coverage—had any been proven—could not survive the plain language of Wesco's exclusion. The district court's judgment was legally correct and should be affirmed.

### c. Ingram's "release" argument premised on *State of California* and *Standun* fails procedurally and substantively.

Ingram's opening brief (pp. 47-52) also argues that no exclusion-triggering "release" of pollutants occurred based on the California Supreme Court's holding in *State of California v. Allstate Ins. Co.,* 55 Cal.4th 186 (2012)*,* and an earlier decision from California's intermediate appellate court, *Standun, Inc. v. Fireman's Fund Ins. Co.*, 62 Cal.App.4th 882 (1998).

Ingram, however, first raised this argument below at oral argument on the Rule 59(e) motion. (3-ER-7 through 8 [footnote 3].) The district court rejected the argument because it "could have been raised on the cross-motions for

summary judgment and thus is not grounds for relief under Rule 59(e)." (*Id.*) That ruling was correct because "[a] Rule 59(e) motion," and certainly oral argument on such a motion, "may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000), emph. orig.

The opening brief never mentions the district court's conclusion and never claims error, let alone abuse of discretion for which this Court reviews a "district court's ruling on a Rule 59(e) motion." *Kijakazi,* 32 F.4th at 847. Ingram cannot claim such abuse for the first time in the forthcoming reply brief and has thus waived challenge to the district court's ruling. *McMillan,* 112 F.3d at 1047. Nor are there "exceptional circumstances" justifying departure from the rule that this Court does not permit "arguments raised for the first time on appeal." *In re Jan Weilert RV, Inc.*, 315 F.3d 1192, 1199 (9th Cir. 2003). Ingram is thus precluded from advancing this theory on appeal.

Ingram's theory is also wrong on the merits. To start with, *Standun* was only "concerned with comprehensive general liability insurance policies containing standard 'sudden and accidental' pollution exclusions." 62 Cal.App.4th at 884-885. So was *State of California*, which, after distinguishing *Standun* on the facts, answered whether "[i]n determining whether the 'sudden and accidental' discharge exception to the policies' pollution exclusion

applies, is the proper focus on the initial deposit of chemical wastes into storage on the site or, instead, on the escape of pollutants from the site into the larger environment?" 45 Cal.4th at 1014.

Both holdings are confined to interpreting the exception to the outmoded "Qualified Exclusion" that restores coverage for "sudden and accidental" polluting events. *MacKinnon*, 31 Cal.4th at 644-645 (discussing history of pollution exclusions). Taken together, *Standun* and *State of California* do nothing more than guide courts tasked with identifying the "relevant" release under a "sudden and accidental" exclusion to "look first to the underlying claims to determine the polluting event," *Standun*, 62 Cal.App.4th at 890, and then to look to the discharge or release on which "the policyholder's liability was based." *State of California*, 45 Cal.4th at 1020. The events on which "liability was based" are "the relevant set of polluting events" in construing the sudden-and-accidental exception, which turns on whether the insured's liability-producing conduct was accidental (within the exception and thus covered) or instead intentional (outside the exception and thus excluded). *Id.* at 1022.

In contrast, whether pollution is negligent or intentional means nothing under Wesco's "Total Pollution Exclusion Endorsement." *American Cas. Co.,* 159 Cal.App.4th at 515. In the first instance, neither *Standun* nor *State of California* offers guidance on how to construe

49

Wesco's exclusion barring coverage for any injury "that would not have occurred in whole or in part but for the … dispersal" or "release … of 'pollutants' at any time."  (2 ER 267.)[10]

But even if *Standun* and *State of California* could be extended beyond the "sudden and accidental" exception to pollution exclusions more generally, they would, again, merely require courts to "look first to the underlying claims to determine the polluting event," *Standun,* 62 Cal.App.4th at 890, and then to the discharge or release on which "the policyholder's liability was based."  *State of California*, 45 Cal.4th at 1020.

Ingram pounces on the *Standun* court's phrase "underlying claims" to first declare Wesco's exclusion inapplicable because "Ingram's *potential liability* is the focus … here."  (AOB 49, emph. orig.)  Ingram urges that "the *Vargas* complaint alleges failure to warn him of the danger of toxic exposure, failure to provide appropriate respiratory protection and failure to take effective measures to suppress dust clouds created during the loading of Vargas' truck." (*Id.*)  It does not, Ingram says, "allege that Ingram was

---

[10] "In light of" its "conclusions" about "the relevant set of polluting events" under the disputed "sudden and accidental" exclusions, the court in *State of California* concluded that it "need not address Insurers' argument that the damages here 'ar[ose] out of' the initial deposit of wastes in a simple ('but for') causal sense."  45 Cal.4th at 1021-1022, bracket orig.

responsible for discharging or depositing the toxic dust and debris onto the soil where he worked" because that dust and debris "was created and deposited by the Camp Fire." (*Id.* at 49-50.)

Ingram, however, continues to misunderstand that pollutant releases occasioned directly by the Camp Fire trigger Wesco's cause-in-fact exclusion, under which Ingram's own legal fault for polluting events is irrelevant. Ingram likewise ignores that Ceres cross-sued him as "responsible in whole or at least in part for" (3 ER 370, ¶ 9) the liability-producing acts Vargas alleged, i.e., negligence causing exposure to toxic clouds of dust. Ingram also ignores that the *Garamendi* court—at 127 Cal.App.4th 487-488— enforced an identical exclusion against a workplace-injury lawsuit even though the complaint included failure-to-warn and inadequate-protective-equipment allegations upon which Ingram now relies.

Ingram's opening brief compounds those errors by analogizing the fire's trail of destruction to the "relevant" releases in *Standun*, i.e., the insured's indiscriminate dumping "of hazardous waste directly into a landfill" without further efforts at containment. 62 Cal.App.4th at 890. As recognized in both *Standun* and *State of California*—again, in addressing the "sudden and accidental" exception not at issue here—"further migration" of waste an insured makes no effort to contain is merely "an aspect of property damage rather than an original release or discharge." *State of*

51

*California*, 45 Cal.4th at 1020.

Ingram claims support in this "further migration" rule in three erroneous ways.

First, Ingram claims the rule creates coverage for *Vargas* because the Camp Fire itself made no effort to contain the pollutants it "deposited." (AOB 50.) A wildfire not containing itself, Ingram says, is a predicate for a rule that, absent attempted containment, "the only polluting event to be considered is the initial deposit of toxic dust and debris onto the soil" and "injury resulting from airborne toxins emanating from the toxic dust and debris is only an instance of damages arising out of that initial deposit." (AOB 50.) "The initial deposit in this case is the deposit … by the Camp Fire," says Ingram, "for which Ingram has no legal responsibility." (*Id.*)

Once again, however, Ingram's legal responsibility for the Camp Fire pollutants remains irrelevant under the cause-in-fact language of Wesco's exclusion. The "further migration" concept upon which Ingram relies is instead tied to the "sudden and accidental" exception that depends upon the nature of an insured's conduct—intentional or accidental. As the court in *State of California* observed, the liability-producing "set of discharges" in *Standun* were " 'purposeful and regular,' not sudden or accidental" and therefore incapable of restoring coverage under the exception. 45 Cal.4th at 1019, quoting *Standun*, 62 Cal.App.4th at 892. By contrast, whether pollution is

intentional or accidental means nothing under Wesco's exclusion.

Second, Ingram claims the "further migration" concept defeats Wesco's exclusion because "toxins emanating from the toxic dust and debris" created by the Camp Fire "is only an instance of damages arising out of that initial deposit." (AOB 50.) *Standun* and *State of California* held that the "further migration" of pollutants initially dumped "without any attempt at containment" is "an aspect of *property damage*" instead of a discrete "release or discharge." *State of California*, 45 Cal.4th at 1020, emph. added. The concept has no application to *Vargas,* a "bodily injury" case in which no injury allegedly occurred until the plaintiff's exposure to pollutants via secondary releases at the cleanup site. The "further migration" rule applying to claims of sudden-and-accidental "property damage" caused by pollution is irrelevant.

Third, even if the "further migration" concept had been implicated, and even if the fire's wreckage had been initially uncontained, the pollutants were later "placed *into containment*" when Vargas and other workers picked it off the ground and loaded it into Vargas's truck. *State of California*, 45 Cal.4th at 1020, emph. orig. When Vargas dumped those loads, he discretely "released" pollutants. *Id*. at 1020-1021. And Vargas alleges those releases as a cause-in-fact of his injuries, which is all that is needed to apply Wesco's exclusion.

**3.    The judgment may be independently affirmed on "dispersal" grounds.**

Recall that Wesco's exclusion also lists a "dispersal" as an excluded pollution mechanism.  "Dispersal" does not "connote some sort of freedom from containment" as does a "release."  *MacKinnon*, 31 Cal.4th at 650-651.  Instead, "the word 'dispersal,' when in conjunction with 'pollutant,' is commonly used to describe the spreading of pollution widely enough to cause its dissipation and dilution."  *Id*. at 652 (cleaned up).

Wesco alternatively argued in the district court that Vargas's lawsuit turns on alleged "dispersal" of pollutants.  (2-ER-130 & 3-ER-459.)  The district court did not reach the point because the court decided that the toxic dust "was released as required to trigger the pollution exclusion" such that it "need not determine whether [the dust] was also dispersed" in order to grant Wesco's summary-judgment motion.  (1-ER-19 [footnote 7].)  This Court need not go beyond the district court's actual ruling to affirm, but if the Court disagrees with the district court about a "release," the Court should nevertheless affirm on "dispersal" grounds.

The opening brief barely addresses this point.  It just includes a perfunctory objection that "Vargas' allegations do not implicate any dispersal mechanism" because "[t]here is no allegation that any contaminant became dissipated or diluted or widely dispersed.  Therefore, Vargas' complaint does not allege any facts to establish a 'dispersal' within the

meaning of Wesco's exclusion."  (AOB 59.)

But that is not true.  To begin with, Wesco's "but for" pollution exclusion applies to any "dispersal" of pollutants that was even an alleged partial cause-in-fact of Vargas's sarcoidosis.  The Camp Fire dispersed pollutants—spread them widely or dissipated—as far as New York City,[11] destroyed tens of thousands of acres of vegetation, trees, and buildings, and resulted in "3.66 million tons of ash, debris, metal, concrete, and contaminated soil."  (3-ER-353, *Vargas* complaint, ¶ 1.)  Those dispersals required the "enormous" (*id*.) cleanup operation described in *Vargas* such that Vargas's injuries could not have occurred without them.  Nothing else is needed to affirm the district court's judgment.

There also remain the discrete "clouds of toxic dust" Vargas encountered at the Camp Fire cleanup project.  (3-ER-359 [*Vargas* complaint] ¶ 32.)  The phase "widely enough" from *MacKinnon* does not require such "clouds" to result in vast spreading or dissipation of pollutants.  Instead, the *MacKinnon* court noted that "one teaspoon of the pesticide sumiturin … dispersed over an area the size of a football field" exemplified a pollutant "being spread throughout a large area" and thus dispersed.  31 Cal.4th at 651 (cleaned up).

---

[11] https://www.cnn.com/2018/11/20/us/california-wildfires-new-york-city-trnd/index.html

In turn, Wesco's original pollution exclusion barred coverage for the "dispersal" of pollutants "[a]t … any … site or location on which any insured or" its contractors "are performing operations … to … clean up" or "remove" pollutants. (2-ER-231 [exclusion clause (e)].) That exclusion encompassed "pollution occurring at a particular location" like the Camp Fire cleanup and dump sites. Croskey, et al., Ch. 7H-I, § 7:2086. Wesco's "far broader" cause-in-fact endorsement does too. *Garamendi,* 127 Cal.App.4th at 487.

In any event the cleanup and dump site areas were exponentially larger than the "football field" discussed in *MacKinnon*, 31 Cal.4th at 651, and Vargas claimed the massive operation "stirred up clouds of dust" (3-ER-358, ¶ 20) to which he was constantly exposed while loading, driving, and unloading his truck. (*Id.* at ¶¶ 20-22.) Common sense dictates that these "clouds of dust" constituted "the spreading of pollution widely enough to cause its dissipation and dilution." *MacKinnon*, 31 Cal.4th at 651.

This is why Vargas described the "air monitoring stations around the community for airborne toxins" (3-ER-357, ¶ 16); measures needed "to prevent dust from flying out and further contaminating the area" (*id.*); and Ceres's failure to "tak[e] steps to ensure adequate dust suppression," all of which negligently caused his sarcoidosis. (*Id.* at 359-360, ¶ 32.) And Vargas based his negligence claim on violation of 8 CCR § 5144 (*id.* at 359-360, ¶¶ 27-36), a regulation titled "Respiratory Protection" and says that when "atmospheric

contamination" with "harmful dusts" cannot be prevented at a worksite through "enclosure or confinement of the operation," "appropriate respirators shall be used pursuant to this section." *Id.* at subd. (a)(1) (emph. added).

Vargas claims Ceres never gave him a respirator (3-ER-353 ¶ 2; 359-360 ¶ 32) and Ceres cross-sued Ingram as "responsible in whole or at least in part for" that conduct. (*Id.* at 370 ¶ 9.) These allegations inherently contemplate that "atmospheric contamination" from the on-site pollutants happened and was indeed impossible to prevent. Such "atmospheric contamination" cannot be plausibly described as something other than an excluded "dispersal."

## 4. **The pollutant releases or dispersals were, "in whole or in part," a cause-in-fact of Vargas's injuries.**

The opening brief alternatively claims error because Vargas's claims do not "fall *wholly* within the pollution exclusion" (AOB 53, emph. orig.), incorrectly suggesting that covered liability outside the exclusion could exist. Ingram advances two reasons that both misconceive what it means for a claim to fall "wholly within" Wesco's exclusion.

### a. **Vargas's allegations of failure to warn and to provide protective equipment cannot defeat Wesco's pollution exclusion.**

Ingram first contends "Vargas has alleged that he contracted sarcoidosis as a result of Ceres' alleged failure to

warn him and to provide him with protective equipment" and "[n]either of these alleged failures falls within the pollution exclusion." (AOB 52.) Then—citing a New York federal case applying New York law to construe different exclusionary language—he declares that "the nature of Vargas's claims and the breadth of Wesco's duty to defend" prevent Wesco's exclusion from barring coverage outright. (*Id.* at 53, citing *WTC Captive Ins. Co. v. Liberty Mut. Fire Ins. Co.*, 549 F.Supp.2d 555 (S.D.N.Y. 2008).)

Wesco's exclusion, however, precludes coverage for any third-party injury "which would not have occurred *in whole or in part* but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (2-ER-267, emph. added.) Citing that italicized language, the district court concluded that the pollution exclusion would bar coverage for the entire lawsuit "[e]ven if the dust exposure only partially caused Vargas's sarcoidosis." (3-ER-17 [fn. 6]; e.g., 3-ER-6-7.)

The district court was correct. In *Garamendi*, the court enforced an identical exclusion despite a contention of "liability … outside the exclusion because the underlying complaints allege that the defendants are responsible for defective products … and that they are liable for having failed to properly warn of risks associated with the use of the products sold." 127 Cal.App.4th at 486. Pointing to the phrases "in whole or in part" and "but for," the court found the exclusion applicable because, "even on the assumption

58

that [the insured's] liability is based on the sale of defective products that contributed to personal injuries caused by silica dust, the injuries would not have occurred but for the discharge of the pollutant" silica. *Id*. at 488.

Similarly, in *24th & Hoffman Investors,* cited above, the court considered an endorsement excluding coverage for claims "arising out of" a list of torts and which carried a " 'catch-all' provision" that "excludes claims … [a]lleged in any claim or 'suit' that also alleges" any of the specified risks. 82 Cal.App.5th at 821. One such risk was habitability claims, and, based on the catch-all provision, the insurer declined to defend an underlying suit in which "some of … the claims did not arise out of habitability issues." *Id*. at 838. The appellate court affirmed a summary judgment for the insurer because the "policy excludes all claims in a suit that alleges violations of the duty to provide a habitable premises, and such claims were unquestionably alleged in the complaint in the underlying action" such that "*none* of the causes of action is potentially covered because *all* are excluded by one portion or the other of the habitability" exclusion. *Id*. at 839, emph. orig. So the non-habitability claims were "not covered because they are alleged in a suit that also alleges [excluded] habitability claims." *Id*. at 840.

So here. Like in *Garamendi*, but for the release and dispersal of the injury-causing pollutants, Vargas would have no damages. Vargas's ancillary but related theories (AOB 51) are excluded because they are advanced in a suit

that also alleges pollution releases and dispersals as the "but for" cause of Vargas's injuries.

### b. Ingram's argument that the cause of Vargas's sarcoidosis "may have been something other than a 'pollutant'" is improper speculation.

The opening brief claims that "Wesco has not conclusively eliminated the potential for coverage in that the cause of Vargas's alleged disease may have been something other than a 'pollutant.'" (AOB 54.) "[M]edical science," says Ingram, "has identified possible causes of sarcoidosis other than toxins" and "this medical evidence establishes the possibility of sarcoidosis allegedly contracted by Vargas was not caused by a pollutant rendering the pollution exclusion inapplicable." (*Id.*) Ingram points to a "Johns-Hopkins University" pamphlet suggesting "bacteria, viruses, or genetics" can also cause sarcoidosis (*id.*) and submits that "Vargas may have contracted sarcoidosis from bacteria, which is not a pollutant." (*Id.* at 55.)

Ingram made these same points below (2-ER-170-171) and the district court rejected them. (3-ER-17, fn. 6.) It did so because Vargas's complaint, and thus Ceres's cross-complaint, says nothing about bacteria, viruses, or genetics. Vargas instead claimed exposure to "clouds" of "toxic dust" and "toxic debris" created by the Camp Fire. (*Id.*; e.g., *Vargas* complaint [3-ER-350 through 366] ¶¶ 22-24, 32-33, 41.) Wesco's exclusion must be construed in light of those

actual allegations under the rule that "[d]etermination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy." *Scottsdale Ins. Co., v. MV Transp.,* 36 Cal.4th at 654.

Ingram's attempt to hypothesize coverage from unpleaded theories about viruses, bacteria, and genetics fails in the first instance in light of the exclusion's phrase "in whole or in part" just discussed. The opening brief admits that the fire-created "toxic dust" and "toxic debris" were pollutants. (AOB 19 ["the wildfire which created the pollution was a natural event"] & 42 ["[t]he pollution had already been 'released' by an act of nature"].) So Vargas plainly alleges injuries within Wesco's exclusion, i.e., injuries "that would not have occurred in whole or in part but for" releases and dispersals of pollutants. (2-ER-267.)

Ingram's theory also violates the cardinal rule that an "insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date" because doing so "misconstrues the principle of 'potential liability' under an insurance policy." *Gunderson v. Fire Ins. Exch.*, 37 Cal.App.4th 1106, 1114 (1995). Vargas sued Ceres in the underlying action, and Ceres cross-sued Ingram, for causing his sarcoidosis by exposing him to "pollutants" in the form of "toxic dust" and "clouds" released from "toxic debris." Ingram's rank

speculation about other medical causes is legally irrelevant.

The same is true of Ingram's protest that it "disputes that Vargas contracted sarcoidosis by exposure to toxic dust and that causation defense is a major issue in the underlying litigation." (AOB 56.)  Ingram is correct that, if a jury "find[s] that the cause of [Vargas's] disease was not toxic dust or debris or any other pollutant," the finding would "preclude an award of damages to Vargas on his theory of liability." (*Id*. at 56-57.)  From that, however, Ingram proclaims "a possibility of coverage" because such an outcome "would also establish that no pollutant caused the disease as alleged and thereby render [the] pollution exclusion both moot and inapplicable." (*Id*. at 57.)

This is legal nonsense.  "An insurer must defend its insured against claims that create a *potential* for indemnity under the policy." *MV Transp.,* 36 Cal.4th at 654, emph. orig.  Ingram's underlying defenses, in its own words, would "preclude an award of damages to Vargas on his theory of liability" if proved at trial. (*Id.* at 56-57.)  "In such a circumstance" Ingram "would not be liable" to anyone "and there would nothing to indemnify" under Wesco's policy in the first instance, i.e., before exclusions become relevant. *All Green Electric, Inc. v. Security Nat'l Ins. Co.*, 22 Cal.App.5th 407, 414 (2018) (enforcing an exclusion to bar duty to defend despite insured's theory that it was legally innocent).  So even were Ingram "technically correct" that a non-pollutant cause of Vargas's sarcoidosis "negates the [pollution]

exclusion, it would not give rise to a duty to defend because the lack of [pollutants] would also negate [Ingram's] liability" altogether. *Id*.

The opening brief evades this foundational point without confronting *All-Green*—raised by Wesco in the summary-judgment and reconsideration proceedings below (2-ER-63-64, fn. 2 & 128-129)—on grounds that "the duty to defend is *broader* than the duty to indemnify" (AOB 57, emph. orig.) such that " 'an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded.' " (*Id*., quoting *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081 (1993).) Ingram misunderstands that the duty to defend extends only to "claims that create potential for indemnity under the policy." *Horace Mann*, 4 Cal.4th at 1081. The court in *All-Green* quoted that very passage from *Horace Mann* (22 Cal.App.4th at 413) in confirming that an insured's underlying affirmative defenses are not "claims" exposing the insured to liability and thus "would not give rise to a duty to defend because the" defenses, if proved, "would also negate [the insured's] liability." *Id*. at 414.

Ingram's legal defenses to the underlying claims are irrelevant to the duty to defend. The district court correctly determined as a matter of law that no such duty exists vis-à-vis the *Vargas* lawsuit.[12]

---

[12] If Vargas had sued for sarcoidosis caused by "bacteria" or "viruses" instead of pollutants, his claims would be

**5.** **Ingram's theory that pollution exclusions cannot apply to workplace-injury claims is legally and textually meritless.**

The opening brief (at pp. 34-38) reasserts Ingram's argument that Wesco's pollution exclusion "is not applicable to toxic exposure in the workplace." (2-ER-116-117, 173-174.) Ingram now claims "[r]esearch has not revealed any California decisions addressing the pollution exclusion in relation to an individual worker injured by toxic material while performing his job." (AOB 35.) Citing *MacKinnon*'s suggestion that pollution exclusions should not bar coverage for a " 'localized toxic injury occurring in the vicinity of intended use,' " Ingram claims "[t]he plain import of [*MacKinnon*'s] limitation on the scope of the exclusion was that such injuries"—workplace injuries, as Ingram calls Vargas's—"are not instances of 'industrial environmental pollution.' " (*Id.*, quoting *MacKinnon*, 31 Cal.4th at 651.)

Ingram never mentions, however, the district court's observation that "*Garamendi* appears to foreclose" this argument because that "court took no issue with the alleged injuries arising from the underlying plaintiffs' exposure to silica dust 'at and throughout their employment.' " (1-ER-22, quoting *Garamendi* at 127 Cal.App.4th 483-484.) The district court also noted that "Ingram cites no California

---

separately excluded by the "Fungi or Bacteria Exclusion," the "Communicable Disease Exclusion," and the "Organic Pathogen Exclusion" in Wesco's policy, which exclude those very sources of liability. (2-ER-217, 259, 273, 299-300.)

authority countering *Garamendi*."  (1-ER-22.)

Ingram still cites no such authority and concedes "the injury in *MacKinnon* (the death of a tenant) did not involve an injury to a worker while engaged in his employment." (AOB 35.)  Because no one asked the California Supreme Court to answer in *MacKinnon* whether employment claims fall outside a pollution exclusion, *MacKinnon* cannot be cited for such a rule because issues "neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925); *Ginns v. Savage,* 61 Cal.2d 520, 524, fn. 2 (1964) ("Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered.")

The lone California decision to consider a pollution exclusion against claims of on-the-job injuries was *Garamendi*, which confirmed that—under an identical exclusion—no coverage existed for two lawsuits claiming the injured plaintiffs "worked in, or were otherwise exposed to, silica at and throughout their employment" and "[du]ring their work life … were injured and damaged" by silica dust creating during "sandblasting operations" at their job.  127 Cal.App.4th at 483.  Enforcing the exclusion in that setting was deemed consistent with *MacKinnon*'s "environmental pollution" requirement.  *Id*. at 485-488.

This Court "must follow the state intermediate

appellate court decision" in *Garamendi* absent "convincing evidence that the [California Supreme Court] likely would not follow it." *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007). No such evidence exists. Since *Garamendi* was issued, neither the California Supreme Court nor any California Court of Appeal has questioned *Garamendi* on workplace-injury grounds or otherwise.

Hence, Ingram cites only non-binding out-of-state cases suggesting such a result and claims the California Supreme Court's imprimatur because *MacKinnon* cited some of them. (AOB 35-37.) As the district court admonished in its reconsideration order (1-ER-7 fn 2), however, *MacKinnon* cited those cases for completely different reasons.[13]

Recall, moreover, that Wesco's disputed exclusion appears via an endorsement (2-ER-267) that replaces the policy's original pollution exclusion. The original exclusion applied to injuries arising from the release or dispersal of pollutants "[a]t or from any premises, site or location on

---

[13] The opening brief also cites *Sandbom*, the Louisiana case Ingram incorrectly invoked in the district court (1-ER-22) to claim injuries during a remediation project cannot be excluded. Now, however, Ingram cites as "relevant and bear[ing] emphasis here" a section of *Sandbom* that addresses Louisiana state law governing a principal's liability to independent contractors. (AOB 34, discussing 674 So.2d from 353-357 [section titled "Liability of BASF"].) That discussion is irrelevant and completely separate from the discussion of the "Pollution Exclusion" (page 364) that the district court rightly found off-point.

which any insured or" its subcontractors "are performing operations … to," inter alia, "clean up" or "remove … 'pollutants.' " (2-ER-231 [exclusion clause (e)].)

No one disputes that the Camp Fire cleanup project described in Vargas's lawsuit was a "premises, site or location" where Ingram "perform[ed] operations" to "clean up" and "remove" "pollutants" such that the standard exclusion would bar coverage for Vargas's injury claims. Wesco's "far broader" endorsement does too. *Garamendi*, 127 Cal.App.4th at 487.

## CONCLUSION

Vargas's underlying lawsuit seeks damages for an injury caused by exposure to pollutants during a dangerous, government-funded project to clean up an environmental disaster. Ingram's strained efforts to frame that lawsuit as a routine negligence case beyond the orbit of Wesco's broad exclusion barring coverage for environmental-pollution injuries fails as a matter of law, fact, and logic.

Wesco respectfully urges the Court to affirm the district court's judgment.

Respectfully submitted,

NIELSEN KATIBAH LLP
/s/ Daniel N. Katibah

Attorneys for Plaintiff and Appellee
WESCO INSURANCE COMPANY

March 23, 2023

## STATEMENT OF RELATED CASES.

There are no known related cases under Ninth Circuit Rule
28-2.6

## CERTIFICATE OF COMPLIANCE

In compliance with Ninth Circuit Rule 32-1, the undersigned certifies that the foregoing Answering Brief is proportionally spaced, has a type size of 14 points or more, and, including footnotes, contains 13,315 words. The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

/s/ Daniel N. Katibah

Attorney for Plaintiff and Appellee
Wesco Insurance Company

March 23, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2023, I arranged to electronically file the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Daniel N. Katibah

March 23, 2023